**UNITED STATES, Appellee,**

v.

**Jorge LEURO–ROSAS, Defendant, Appellant.**

**No. 91–1231.**

United States Court of Appeals, First Circuit.

Heard Oct. 10, 1991.

Decided Dec. 30, 1991.

Joseph C. Laws, Jr., San Juan, P.R., by appointment of the Court, for defendant, appellant.

Karen Skrivseth, Atty., Dept. of Justice, with whom Daniel F. Lopez Romo, U.S. Atty., D. Puerto Rico, and Jorge Vega–Pacheco, Asst. U.S. Atty., D. Puerto Rico, were on brief, for appellee.

---

Before CAMPBELL, Circuit Judge, BROWN,* and BOWNES, Senior Circuit Judges.

JOHN R. BROWN, Senior Circuit Judge, sitting by designation:

Appellant Jorge Leuro–Rosas, captain of the M/V ARGOVIND, challenges his conviction for possession with intent to distribute cocaine, in violation of 46 U.S.C.App. § 1903(a). Specifically, Leuro–Rosas claims that the district court erred in holding that the United States Coast Guard had jurisdiction to board and search the M/V ARGOVIND while in international waters. He also claims that the district court erred in denying his motion for acquittal. Finding no error, we affirm.

### Suspicious Activities

On September 30, 1989, the Coast Guard cutter NANTUCKET was patrolling in international waters in the vicinity of Saba Bank and Saba Island, 60 nautical miles southeast of St. Croix, Virgin Islands. At about 10 p.m. the commanding officer of the NANTUCKET, Coast Guard Lieutenant George Dupree, heard on the ship's radio scanner a conversation in Spanish between two vessels, which a Petty Officer translated for him. The two vessels, the M/V ARGOVIND, under Leuro–Rosas, as master, and the PETRA, were attempting to rendezvous. Apparently unable to see the PETRA, Leuro–Rosas radioed, "we have got to get closer." The PETRA illuminated a search light which the M/V ARGOVIND could not see. During the radio conversation, Leuro–Rosas asked the PETRA, "Have you talked to Barranquilla today?" The PETRA replied that it had not. Leuro–Rosas then commented, "I wish the others would hurry up. I am tired of holding this cargo."

Lt. Dupree concluded that the ships were engaged in drug smuggling. As the NANTUCKET prepared to intercept the M/V ARGOVIND, the PETRA stated, "We have a stranger with us," and Leuro–Rosas responded, "I have a piece of junk that is following me." After a few minutes of silence, the PETRA transmitted, "I don't like this. I am getting out of here." Leuro–Rosas presumably panicked, saying "What do I do? What do I do?" Announcing it was heading north, the PETRA instructed the M/V ARGOVIND to "go the other direction." The NANTUCKET observed on its radar that the M/V ARGOVIND, while doubling its speed to eight or nine knots, changed course to the south. As the NANTUCKET approached the M/V ARGOVIND, Leuro–Rosas said to the PETRA, "The dogs are here, the dogs are here". As the NANTUCKET neared to within 100 yards of the M/V ARGOVIND, it turned on all its flood lights, announced on the loudspeaker that it was the Coast Guard, and directed the M/V ARGOVIND to stop. Leuro–Rosas then radioed that "The Coast Guard got me, call Barranquilla and tell them the Coast Guard got me."

Lt. Dupree, over the radio, repeated his order to stop. Leuro–Rosas responded by identifying himself as Enrique Leuro, the captain and master of the M/V ARGOVIND. He stated that the M/V ARGOVIND's last port of call was Barranquilla, Colombia, and that its next port would be either the Dominican Republic (west of Puerto Rico and Saba Island) or Antigua (east of Saba Island), depending on instructions he was awaiting from his company. When asked about his cargo, Leuro–Rosas initially stated he was carrying none. When asked a second time, Leuro–Rosas replied that he was carrying some glassware. He added that his crew consisted of nine men, all of whom left Barranquilla with him on September 26, 1989.

Leuro–Rosas granted consent to Lt. Dupree to board the M/V ARGOVIND. Officer Glenn Gebele headed the five-man boarding team which searched the vessel. At Gebele's request, Leuro–Rosas assembled his nine-member crew on deck, and produced the M/V ARGOVIND's Panamanian registry and cargo manifest.[1]

---

* Of the Fifth Circuit, sitting by designation.

1. The manifest showed that the M/V ARGOVIND left Barranquilla for Santo Domingo with

five pallets of a yeast-like substance, three boxes of brake parts, and seven containers of glass-

Leuro–Rosas permitted the boarding party to conduct an initial safety inspection of the vessel and then to search the vessel and its cargo except the contents of the containers. Leuro–Rosas explained that he did not want the containers opened because they had been locked and sealed when they were loaded onto the vessel, and were to be delivered in the same condition.[2] During its initial search, the Coast Guard found no drugs or weapons.

Thereafter, Lt. Dupree contacted his operational commander in San Juan to obtain a Statement of No Objection (SNO) through the State Department for the exercise of United States' law enforcement authority on board the Panamanian flag vessel.[3] After receiving the SNO at 8:20 a.m. on October 1, 1989, Lt. Dupree instructed the boarding team to open the containers and check their contents.

After examining the contents of four containers, the Coast Guard escorted the M/V ARGOVIND to the Coast Guard dock in San Juan, Puerto Rico to complete the inspection more safely.

In San Juan, Customs Service and Coast Guard personnel resumed the search. In one container, officials discovered 40 bales of cocaine wrapped in plastic. Thirty-nine of the bales contained 30 one-kilogram bricks of cocaine, and one contained 25 one-kilogram bricks. They also found an open burlap bag that contained 10 one-kilogram bricks of cocaine. The cocaine weighed a total of 1211 kilograms and was 87% pure. Captain and crew were then arrested.

Leuro–Rosas and nine co-defendants were subsequently indicted in the United States District Court for the District of Puerto Rico on one count of possessing approximately 1205 kilograms of cocaine on board the M/V ARGOVIND on the high seas, with the intent to distribute it, in violation of 46 U.S.C.App. § 1903(a) and (c)(1)(C).

Following a six-day jury trial, Leuro–Rosas and his co-defendants were convicted. They moved for judgments of acquittal, F.R.Cr.P. 29, on the grounds that the United States lacked jurisdiction over the case and that the evidence to support the convictions was insufficient. The district court denied Leuro–Rosas' motion, but granted the motions as to his co-defendants, finding that the evidence was insufficient to support their convictions.

*Who's in charge here anyway?*

█ Leuro–Rosas claims that the United States Coast Guard lacked jurisdiction to stop and board the M/V ARGOVIND because the Department of State failed to obtain Panama's SNO from a then-in-office Panamanian official. Panama's SNO to board the ship was based exclusively on representations made by then-deposed Panamanian President Delvalle that gave the United States blanket authorization to

---

ware; one of the containers was listed on a separate page of the manifest.

2. Each of the seven metal containers was the size of a boxcar with large doors on one end. The containers were each closed with a brass padlock and a metal seal that could only be opened by breaking the seal.

3. The procedure for obtaining a SNO involved the San Juan Coast Guard Office's routing the request through the Miami Coast Guard Office to the Office of the Commandant of the Coast Guard in Washington, D.C. which, in turn, contacted Coast Guard Liaison Officer Bruce Leek at the Department of State.

Once contacted, Leek himself made a conference call starting at 3:30 a.m. on October 1, 1989, to Department of State attorney Ashe Roach, Department of Justice attorney Kevin Connelly, and Panamanian desk officer Richard Dawson. They reached American Ambassador to Panama, Arthur Davis, in Colorado. Davis told Leek that the United States had authority to board the M/V ARGOVIND because he had received, some five weeks earlier, standing verbal authority from former President of Panama Eric Arturo Delvalle to board Panamanian vessels if there was suspicion of drug activity. At the time Davis conveyed this information to Leek, Delvalle was no longer President of Panama since his term had expired on August 31, 1989. Nevertheless, Leek concluded that the United States had authority to conduct law enforcement activities on board Panamanian vessels, and, therefore specifically authorized the Coast Guard to search the M/V ARGOVIND. On November 24, 1989, Leek executed a declaration, sealed by the Secretary of State three days later, confirming the authority. No United States official discussed the possible boarding with any then-Panamanian official.

board Panamanian ships. Rather than fulfill the procedural requisites in obtaining a SNO, which requires a case-by-case evaluation, the United States, Leuro–Rosas charges, relied on a prior verbal authorization from Delvalle who, at the time the SNO was sought to board the M/V ARGO-VIND, was no longer president of Panama.[4] Leuro–Rosas concludes that the Coast Guard should have sought permission to board from the Noriega-backed government despite our country's refusal to recognize that regime. This appeal brings into play the statutory scheme established by Congress to enable United States Coast Guard Vessels to board, search and direct foreign vessels on the high seas.

Sections 1–4 of The Maritime Drug Law Enforcement Act (46 U.S.C.App. §§ 1901–1904)[5] ("The Act") is the amended and recodified version, effective November 10, 1986, of 21 U.S.C. § 955a.[6] Section 1903(a) provides that "[i]t is unlawful for any person ... on board a vessel subject to the jurisdiction of the United States ... to possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C.App. § 1903(a). Section 1903(c)(1)(C) explains that a vessel subject to the jurisdiction of the United States includes "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C.App. § 1903(c)(1)(C). The section continues:

> Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States under subparagraph (C) ... of this paragraph may be obtained by radio, telephone, or similar oral or electronic means, and may be proved by certification of the Secretary of State or the Secretary's designee.

46 U.S.C.App. § 1903(c)(1).

The Act intended to liberalize the documentation requirements for proving a foreign nation's SNO. This aim is directly borne out by the Legislative History of the Act:

> Obtaining documents from foreign governments that are sufficient to withstand evidentiary objections in a U.S. courtroom can take months. This is especially the case because the foreign governments, unfamiliar with U.S. legal procedures, have to generate the required documents.

> On occasion, delays in acquiring the necessary documents have jeopardized cases because of the U.S. constitutional requirement to afford defendants with a speedy trial. It is estimated that acquiring such documentation consumes from 2.5 to 8 days of U.S. Government personnel time for each case.

---

**4.** Eric Arturo Delvalle was elected First Vice President of the Republic of Panama in September 1984, and was sworn in as President of Panama in September 1985, to succeed Nicolas Paleta, who had resigned. Under the Panamanian Constitution, presidential elections are held every five years in May, and the winner is installed in September of the same year. Delvalle's term was thus set to expire August 31, 1989. During his term of office, however, Delvalle was forced into hiding by Panamanian strongman General Manuel Antonio Noriega. Delvalle remained in hiding until late December 1988, when he fled to Miami, Florida. At Leuro–Rosas' trial, Ambassador Davis' testified that the United States did not diplomatically recognize the Noriega government; instead, it recognized Delvalle as Panama's leader until August 31, 1989, and recognized no Panamanian government again until December 20, 1989, following the United States' invasion, when a legitimate government was installed with Guillermo Endara as President.

**5.** Congress passed the Maritime Drug Law Enforcement Act provisions twice. The provisions codified at 46 U.S.C.App. §§ 1901–1904 were first enacted on October 27, 1986, by the Maritime Drug Enforcement Prosecution Improvements Act of 1986, Pub.L. 99–570, §§ 3201–3202, 100 Stat. 3207–95 to 3207–97. Substantially identical provisions were reenacted November 10, 1986, by section 17 of the Coast Guard Authorization Act of 1986, Pub.L. 99–640, 100 Stat. 3552–3554.

**6.** 21 U.S.C. § 955a provides:

> It is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

S.Rep. No. 99–530, 99th Cong., 2d Sess. 15 (1986), reprinted in 1986 U.S.Code Cong. and Admin.News (USCCAN) 5986, 6000–6001.

Thus, in an effort to ease courtroom evidentiary requirements, Congress authorized the necessary documentation for a SNO to be generated from within this country, rather than from the foreign nation involved. Again, the Legislative History of the Act reflects Congress' clear intent on this matter:

> In instances where the United States is required to prove a foreign nation's consent or waiver of objection to U.S. enforcement, or such a nation's denial of claim of registry, this section permits proof by certification of the Secretary of State or the Secretary's designee. Such a certification should spell out the circumstances in which the consent, waiver, or denial was obtained, including the name and title of the foreign official acting on behalf of his government, the precise time of the communication, and the means by which the communication was conveyed.

*Id.* at 6001.

In the instant case proof by State Department certification fulfilled substantially each of the requirements articulated by Congress. The certification was sworn to by Bruce Leek in his declaration dated and signed on November 24, 1989.[7] Leek's dec-

laration was signed and sealed by the Secretary of State, thus certifying Leek as the Secretary's designee. The declaration read:

## DECLARATION

Bruce E. Leek declares as follows:

1. That I am Bruce E. Leek, and that I have been assigned to the Bureau of International Narcotics Matters, Department of State, since June 15, 1989.

2. That in my official capacity, I have been designated by the Secretary of State through the Assistant Secretary of State for International Narcotics Matters, to make certifications provided by Section 3202 of Public Law 99–570, the Maritime Drug Law Enforcement Prosecution Improvement Act of 1986.

3. I certify that Mr. Eric Arturo Delvalle, then-President of the Republic of Panama, represented his government with authority to verify the registry of vessels claiming Panamanian registration and to consent to the enforcement of law against its vessels by other nations; and that then-President Delvalle, in the presence of the United States Ambassador to Panama, Mr. Arthur Davis, authorized the U.S. Government to board private vessels claiming Panamanian registration and enforce laws of the United States as appropriate to the facts of each case.

---

7. Leuro–Rosas cites *United States v. Maynard*, 888 F.2d 918 (1st Cir.1989) for the proposition that the Coast Guard in the instant case failed to follow the procedural steps in obtaining a valid SNO and that, as in *Maynard*, the conviction should therefore be overturned.

In *Maynard*, the Coast Guard stopped a vessel that was flying a courtesy flag from the British Virgin Islands, and the master claimed the vessel was British. The vessel had no registration or documentation of nationality, however, and the Coast Guard obtained from the Department of State a SNO declaring the vessel to be stateless. No contact was made either with Great Britain or the British Virgin Islands for a SNO to board the vessel. This Court held that the vessel was not a "vessel without nationality" under 46 U.S.C.App. § 1903(c)(1)(A). It explained that a vessel was one without nationality only if the master of the vessel claimed registry which the flag nation denied, or if the master failed to claim registry or nationality. 46

U.S.C. § 1903(c)(2). It explained further that a claim of nationality or registry could be made in any one of three ways under 46 U.S.C. § 1903(c)(3): by producing registration documents, by flying its flag nation's ensign or flag, or by making a verbal claim of nationality or registry. This Court found that the vessel had met at least one of these requirements, and that the failure to produce registration documents was not fatal to the claim of registry. Thus, this Court ruled, the Coast Guard should have sought a SNO from either Great Britain or the British Virgin Islands before searching the vessel.

Here, by contrast, no contact was made with Panama to obtain a SNO simply because the United States Government recognized no legitimate government in Panama at that time. Accordingly, unlike the situation in *Maynard*, there was no government in Panama to contact on October 1, 1989; thus, the error in *Maynard* was not repeated here.

4. That on October 1, 1989, the Government of Panama, as such not currently established according to its law and constitution, was unable to verify or deny that M/V ARGO VIND [sic] was validly registered under the laws of the Government of Panama.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 24, 1989

Bruce E. Leek

Maritime Law Enforcement Officer

The Department of State certification established (i) the circumstances in which the consent to board Panamanian ships was obtained (Delvalle's authorization to Amb. Davis), (ii) the name and title of the foreign official acting on behalf of his government in granting such consent (President Delvalle acting on behalf of the Republic of Panama), and (iii) the means by which the consent was conveyed (Delvalle's authorization "in the presence of" Amb. Davis). Although the certification failed to spell out the precise time of Delvalle's standing authorization to board Panamanian ships, such omission is not decisive since Delvalle's consent was interpreted by the State Department as a standing grant of authority to last until the next legitimate Panamanian government took office. Likewise, the specific time of the oral authorization was not decisive. The language of section 1903's legislative history speaks in terms of what circumstances the certification "*should* spell out." (emphasis added). Therefore, it was not imperative that the certification reflect the precise time of Delvalle's authorization. At any rate, at trial Ambassador Davis testified that Delvalle's oral authorization to board Panamanian ships came on August 22, 1989, and that Delvalle repeated his authorization at a ceremony at the Panamanian Embassy in Washington D.C. on August 31, 1989.[8]

Leuro–Rosas suggests that despite our government's refusal to recognize the illegitimate Panamanian regime in power on October 1, 1989, Leek, nevertheless, should have sought the SNO from some member of the Noriega-backed government. The Supreme Court, however, has acknowledged that the President has exclusive authority to recognize or refuse to recognize a foreign state or government and to establish or refuse to establish diplomatic relations with it. *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137, 58 S.Ct 785, 791, 82 L.Ed 1224 (1938) ("What government is to be regarded here as representative of a foreign state is a political rather than a judicial question, and is to be determined by the political department of the government."). The United States Government was, therefore, entitled to determine that there was no legitimate government in Panama on the date the SNO was requested. Likewise, the State Department may diplomatically recognize any foreign leader it chooses to recognize, and such a choice, since it is a political question, is made free from judicial review. In fact, paragraph three of the State Department's certification authorizing the SNO established that President Delvalle "represented his government with authority ... to consent to the enforcement of law against its vessels by other nations[.]"[9] Therefore, it was proper for Delvalle's "standing authorization" to justify the granting of the SNO. We are unable to agree with Leuro–Rosas, and hold that the State Department was bound to seek the SNO from the Noriega regime only. Such a holding would be beyond our judicial role and would allow hostile or illegitimate governments' vessels to travel international waters with impunity; given the nature of today's drug cartels, such a holding is unacceptable and would run contrary to the intent of Congress.[10]

---

8. Ambassador Davis also testified that on August 31, 1989, Delvalle stated that he had prepared a written grant of authority for the United States to board Panamanian vessels. Davis added that he received the writing "about the middle of September [1989]."

9. That is, in the absence of any legitimate Panamanian government from which the Coast Guard could seek a SNO, The United States chose to recognize Delvalle's authorization to board Panamanian vessels as the official will of the country of Panama.

10. As for the applicability of 46 U.S.C.App. § 1903(d) to this case, see this Court's opinion in *United States v. Maynard*, 888 F.2d 918, 926–

■ Confronted with an identical seizure of a Panamanian vessel on the high seas, a seizure which occurred so near in time to the seizure in this case that the SNO in each case was obtained during the same phone call, the Fifth Circuit has held that the State Department's recognition of Delvalle's August 22, 1989 authorization to board Panamanian vessels was beyond judicial review. We join the Fifth Circuit in this view. *United States v. Segura Pretel*, 939 F.2d 233, 236 (5th Cir.1991) (because Ambassador Davis testified that Delvalle was the leader recognized by the U.S. State Department at the time of the vessel's seizure, the trial court correctly held the SNO as valid without submission of the issue to the jury).

*1211 kilograms of cocaine on the high seas*

■ Leuro–Rosas contends that the district court erred in submitting the case to the jury and in denying his post-verdict motion for judgment of acquittal because the evidence against him was not sufficient to support the trial court's finding that he knowingly or intentionally possessed the cocaine.

On appeal, we review the circumstantial evidence supporting Leuro–Rosas' conviction in the light most favorable to the verdict to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Piedrahita–Santiago*, 931 F.2d 127, 130 (1st Cir.1991).

The evidence of Leuro–Rosas' guilt is overwhelming. The M/V ARGOVIND had sailed from Barranquilla, Colombia, a known drug port. The M/V ARGOVIND was attempting to rendezvous in the middle of the night on the high seas with another vessel. When the M/V ARGOVIND and the PETRA were trying to meet, Leuro–Rosas asked the PETRA whether it had heard from Barranquilla that day. When the M/V ARGOVIND spotted the Coast Guard vessel NANTUCKET, Leuro–Rosas said in a panicky voice to the PETRA, "The dogs are here. The dogs are here. Call Barranquilla and tell them." The ships changed direction when they discovered that the Coast Guard had seen them. Leuro–Rosas initially failed to respond to the NANTUCKET's attempts to reach him by radio. *Piedrahita–Santiago*, 931 F.2d at 131 ("Failure to respond to radio calls, coupled with evasive maneuvering, implies knowledge of wrongdoing," citing *United States v. Beltran*, 761 F.2d 1, 7 (1st Cir. 1985)). Once contacted, Leuro–Rosas claimed he was awaiting instructions from his shipper before deciding on his next port, a claim that lacked credibility because it was entirely inconsistent with standard shipping practice. Moreover, Leuro–Rosas changed his story to the Coast Guard about whether he was carrying cargo, and his manifest did not match the cargo he was carrying, a discrepancy for which he had no explanation. Finally, the volume (1211 kilograms) and value of the contraband were enormous, the crew was large enough to offload the cocaine on the high seas, and the cocaine was in a container that could be accessed while the ship was at sea.

There was sufficient evidence for the jury to have found Leuro–Rosas guilty beyond a reasonable doubt. *See, e.g., Piedrahita–Santiago*, 931 F.2d at 130–131. We hold there was no error.

AFFIRMED.

927 (1st Cir.1989); *accord United States v. Mena,* 863 F.2d 1522, 1530–1531 (11th Cir.1989).