UNITED STATES of America, Plaintiff,

v.

Joaquín Cardona SANDOVAL, Alejandro Rojano Rangel, and Jorge Gómez Olarte, Defendant.

Crim. No. 90–084 (JP).

United States District Court,
D. Puerto Rico.

Feb. 10, 1992.

See also, 770 F.Supp. 64, 770 F.Supp. 762.

Jeannette Mercado Ríos, Asst. U.S. Atty., Hato Rey, P.R., for plaintiff.

David Román, Old San Juan, P.R., for defendant Cardona Sandoval.

Charles Rodríguez, Isla Verde, P.R., for defendant Rojano Rangel.

Juan R. Acevedo, Hato Rey, P.R., for defendant Gómez Olarte.

OPINION & ORDER

PIERAS, District Judge.

The Court has before it Defendants' Motion for Judgment of Acquittal After Dis-

charge of Jury, which was filed pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. For the reasons set forth below, the motion is hereby DENIED.

## I. Background

Defendants' motion arises out of the trial of four defendants, Joaquín Cardona Sandoval, Alejandro Rojano Rangel, Jorge Gómez Olarte and Alfonso Molina, who were charged in a one-count indictment with possession with intent to distribute approximately 168 kilograms of cocaine, in violation of Title 46, United States Code App., Sections 1903(a), (b)(1) and (f) and Title 18, United States Code, Section 2. On August 5, 1991, a jury found defendants Cardona, Rojano and Gómez guilty while it found defendant Molina not guilty.

The following facts were established during the trial.[1] On February 26, 1990, the U.S.S. Biddle, a Navy guided missile cruiser, was patrolling the Caribbean Sea with orders to board any vessel heading north. A vessel with Florida Registration Number FL 8304 EM, also known as the WICHO, was sighted heading north and boarded by a team of United States Coast Guard crew members from the Biddle. The team proceeded to perform a routine document and safety inspection stop. The defendants, who were the captain and crew of the vessel, were found on board. Defendant Cardona identified himself as the ship's captain and produced a copy of the vessel's registration. Since Cardona was unable to produce the vessel's original registration he received a citation for which he was required to pay a fine. The copy of the registration reflected that one Luis Rodríguez was the owner of the vessel; however, upon being questioned, Cardona stated that the owner was one Roberto de Armas.

Upon concluding the document and safety inspection, the boarding party returned to the Biddle. Later that evening, a meeting of the entire boarding team was held in accordance with standard post-investiga-tion procedures. At this time the team made the following observations:

(a) the FL 8304 EM was a home-made, cabin-type, 43–foot vessel, whose deck was in a rotting condition;

(b) the defendants were from Colombia, a well-known drug source country;

(c) the defendants claimed they were en route to deliver the vessel to St. Martin in the United States Virgin Islands, after which time they would fly back to Colombia;

(d) all of the defendants appeared to sleep in the same area, on deck, on twin size mattresses;

(e) the vessel appeared to be freshly painted but much of the paint was peeling;

(f) a United States of America flag was taped around the vessel's flagpole;

(g) the defendants did not respond to radio or loud hailer communications transmitted in both English and Spanish; and

(h) the vessel was riding low in the water.

During the meeting it was discovered that due to an illness afflicting one of the boarding party members, and the failure of his replacement to conduct a thorough search, a complete space accountability had not been made. It was decided that the vessel should be boarded for a second time so that a complete inspection could be conducted. Upon spotting the FL 8304 EM the next day, now travelling in a northeasterly direction, the team reboarded the vessel. After completing the second search, it was decided that the boat should be taken to shore in Puerto Rico for a dockside search. On February 28, 1990, as the FL 8304 EM was being taken into port, its engine failed. It had to be towed the remaining distance.

After the dockside search, which lasted six days and culminated in a destructive search of the vessel, approximately 167 kilograms of cocaine with an 80 percent puri-

---

**1.** The Court presents its summary of the factual background of this case mindful that in the context of a Rule 29 motion all evidence must be viewed in a light most favorable to the government. *See, infra,* text at p. 278 (discussing standard of review).

ty were discovered concealed inside two large structural beams which ran along the entire length of the vessel's hull. The government's witnesses testified that given these conditions the crew apparently had only very difficult access to the contraband. A videotape of Coast Guard and Customs agents searching the vessel which was shown to the jury illustrated, however, how the cocaine was divided into small packages neatly set against a plank of wood and connected by a rope which, when pulled, eased the retrieval of the cocaine. No additional contraband was found on board the vessel. The various searches did uncover, however, a grinding tool capable of cutting large solid objects, fiberglass shavings in one of the crew member's sleep cushions, and a removed section of one of the structural beams, which contained fiberglass.

Customs Special Agent Roberto Jusino testified that defendant Cardona told him he was to be paid 80,000 Colombian pesos for the trip. Defendant Rojano told him that through the agreement he had made with Cardona he was to receive 60,000 Colombian pesos for the trip. Agent Jusino also testified, however, on cross-examination, that the exchange rate for Colombian pesos is very low, suggesting that the amounts paid were reasonable for the task in which defendants claim they were engaged. Agent Jusino further testified that defendant Rojano explained that the crew was to monitor a particular radio frequency and should speak over the open frequency only after hearing the words "Rojo, Rojo." [2]

At the close of the government's case, defendants made a motion to acquit prior to the submission of the case to the jury under Rule 29(a). The motion was denied, as were motions for reconsideration. Since the defendants chose not to present any evidence of their own, the case was then submitted to the jury, at approximately 2:30 p.m. on Friday, August 2, 1991. Later that day, at approximately 10:30 p.m., the jury sent a note to the Court stating that two of the jurors were ill and requesting a recess until the next day or until Monday. After a discussion with defense counsel, it was agreed that the jury should return on Monday, August 5, 1991, to continue their deliberations. The jury was excused for the weekend after the Court instructed the jury, using language chosen by defense counsel, not to read newspapers or watch newscasts over the weekend.

On Sunday, August 4, 1991, two articles appeared in the *San Juan Star*, an English-language general circulation newspaper, which concerned matters associated with drug smuggling. One article, which appeared as the lead story on the paper's front page discussed increased efforts by the Coast Guard to interdict narcotics shipments in the Caribbean. The other article, which appeared on page two, discussed the efforts of the Government to seize the assets of alleged drug traffickers in Puerto Rico. The story discussed the aggressive confiscation policy instituted by the Government and detailed the charges of critics that the policy left some defendants without funds to hire an attorney. In an effort to illustrate the effects of the policy, the story quoted a "federal judge who spoke confidentially," who stated: "The nature of things is that if you pay a lawyer $100,000 you get better service than if you didn't pay anything." Neither article contained any mention of any aspect of the instant case.

The jury reassembled as instructed at 9:00 a.m. on August 5, 1991. At that time defense counsel moved that the Court *voir dire* the jury as to their knowledge of the two stories. The Government opposed the motion. The Court denied the motion on the grounds that the defendants had not set forth sufficient information to overcome the presumption that the jury followed the Court's instruction not to read newspapers over the weekend.

Shortly before 10:00 a.m., the jury sent a note to the Court which stated:

Your Honor:

Good morning!

May we have some coffee?

---

**2.** In English: "Red, Red."

Another thing, the jury would like to know, are all the defendants represented by public defendants (sic) assigned by the court? And who represents whom? After a discussion with counsel to determine the appropriate response to the jury's query—during which defense counsel requested that the jury be told that all defense counsel were paid by the Court—the Court instructed the jury that it was not to consider the matter of who paid for defense counsel.

Shortly after resuming their deliberations, the jury sent another note to the Court requesting that their memories be refreshed "regarding certain aspects of the defendants' declarations to [Agent] Jusino." The relevant testimony, which concerned the defendants' statements regarding the amount of money they were paid for their work aboard the FL 8304 EM, was read to the jury. Thereafter, the jury returned its verdicts.

## II. Discussion

### A. Sufficiency of Evidence

■ Defendants' first ground for acquittal is that the evidence presented at trial was insufficient to find the defendants guilty of knowing and intentional possession with intent to distribute a controlled substance. *See* 46 U.S.C.App. § 1903(a); 18 U.S.C. § 2. Rule 29(c) of the Federal Rules of Criminal Procedure provides that where a verdict of guilty is returned after a jury trial a court may, upon a motion for judgment of acquittal, set aside the verdict and enter judgment of acquittal.[3] The standard of review for such motions is "whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt." *United States v. Doe*, 921 F.2d 340, 343 (1st Cir.1990) (quoting *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964)); *see*

*also United States v. Medina–García*, 918 F.2d 4, 7 (1st Cir.1990) (test is whether "a rational trier of fact could not have concluded that every essential element of the crime charged was proven beyond a reasonable doubt.") In making its determination, a court must consider the evidence and all reasonable inferences in the light most favorable to the government. *Medina–García*, 918 F.2d at 7. "The prosecution ... need not exclude every reasonable hypothesis of innocence as long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. McHugh*, 769 F.2d 860, 867 (1st Cir.1985) (citing *United States v. Gabriner*, 571 F.2d 48, 50 (1st Cir.1978)); *see also United States v. Almonte*, 952 F.2d 20, 24 (1st Cir.1991) (the fact that an alternate, legitimate explanation can be put forth for defendant's conduct does not preclude jury finding of guilt).

■ Defendants were found aboard a vessel transporting a considerable amount of cocaine; however, it is well-settled that "mere presence" on a vessel carrying narcotics is insufficient evidence to support a conviction under 46 U.S.C.App. § 1903(a), (b)(1). *See, e.g., United States v. Quejada–Zurique*, 708 F.2d 857, 859 (1st Cir.), *cert. denied, Morejón–Ortega v. United States*, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983). Knowledge and intent are essential elements which the prosecution must prove. *See United States v. Steuben*, 850 F.2d 859 (1st Cir.1988); *United States v. Molinares Charris*, 822 F.2d 1213 (1st Cir. 1987); *Quejada–Zurique, supra*.

The First Circuit has had several opportunities to discuss the application of Rule 29 in cases with factual scenarios very similar to this case. In doing so, the Circuit Court has refined the standard of review summarized above. The Circuit has stated that a trial court should "determine whether a rational juror could conclude, beyond a reasonable doubt, that each defendant

---

**3.** Rule 29(c) provides, in pertinent part:

If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be

made.... If a verdict of guilty is returned the court may on such motion set aside the verdict and enter a judgment of acquittal.

knew that there was a controlled substance aboard the [vessel] and intended in some manner to facilitate its distribution." *U.S. v. Passos–Paternina*, 918 F.2d 979, 984 (1st Cir.1990), *cert. denied, Estupiñan v. United States,* —— U.S. ——, 111 S.Ct. 1637, 113 L.Ed.2d 732, *and cert. denied, Arevalo v. United States,* —— U.S. ——, 111 S.Ct. 2809, 115 L.Ed.2d 981 (1991) (cit-ing *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1074 (1st Cir.1985), *cert. denied, Mosquera v. United States,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986); *United States v. Corpus,* 882 F.2d 546, 550 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3251, 111 L.Ed.2d 761 (1990)); *see also Quejada–Zurique,* 708 F.2d at 859 (evidence must be reviewed in light most favorable to the government). The Circuit Court has also stated that a Rule 29 motion should not be granted un-less a court feels it "can set aside th[e] verdict without impermissibly invading that province of factfinding and commonsense inference that the law reserves to a jury." *Guerrero–Guerrero,* 776 F.2d at 1073, 1075 (interpretation of inferences depends on factfinders views about human behav-ior, but "[o]ur system ... gives jurors, not judges, the responsibility for formulating such views and answering such ques-tions"). The jury is entitled to choose among varying interpretations of the evi-dence as long as the interpretation they choose is reasonable. *Quejada–Zurique,* 708 F.2d at 859 (citing *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983)); *id.* at 860 (citations omitted) ("The Eleventh Circuit views it as well-established that ... the burden on the United States to establish the participation by any crew member on a ship heavily laden with marijuana over a period of sev-eral days ... is relatively light.")

■ The government's case against the defendants, with the notable exception of the cocaine itself, was constructed out of circumstantial evidence. It should be not-ed, however, that the nature of the evi-dence is immaterial when viewed in a Rule 29 context. The First Circuit has ex-plained:

[W]e have specifically stated that "in the context of review of a motion for acquit-tal, 'no legal distinction exists between circumstantial and direct evidence.'" Furthermore, it is unquestioned that di-rect evidence need not be presented. Ju-dicial authority teaches us that "the government can use circumstantial evi-dence as long as the evidence, viewed as a whole, is sufficient to warrant a rea-sonable jury to conclude that the defen-dant is guilty beyond a reasonable doubt."

*United States v. Doe,* 921 F.2d 340, 343–44 (1st Cir.1990) (citations omitted).

■ The circumstantial considerations which, in this case, "lend support to a rea-sonable inference that a defendant aboard a vessel had knowledge that the cargo in-cluded controlled substances" (*Passos–Pa-ternina,* 918 F.2d at 984–85) include the following. First, the FL 8304 EM was a very small vessel on an extended voyage carrying a large amount of contraband. A substantial number of First Circuit cases have held that such a condition can lead to a reasonable inference of guilty knowledge. *See, e.g., United States v. Robinson,* 843 F.2d 1, 8 (1st Cir.), *cert. denied,* 488 U.S. 834, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988) (and cases cited therein); *United States v. Beltrán,* 761 F.2d 1, 6 (1st Cir.1985); *Unit-ed States v. López,* 709 F.2d 742, 746 (1st Cir.), *cert. denied,* 464 U.S. 861, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983); *Guerrero–Guerrero,* 776 F.2d at 1077. The Court has explained that the rationale of these opinions is that given the necessarily close relation of crew members on a small vessel full of narcotics it is reasonable for the jury to conclude that " 'conspirators en-gaged in conduct which by its nature is kept secret from outsiders, would reason-ably not allow the presence of innocent bystanders in their midst while conducting a lengthy, illegal operation.'" *United States v. Luciano Pacheco,* 794 F.2d 7, 11 (1st Cir.1986) (quoting *Beltrán* at 6) (other citations omitted). In addition, the contra-band was very valuable. At least in regard to defendant Cardona, the captain of the vessel, this fact can be separately viewed

as circumstantial evidence of knowledge. *Accord Passos–Paternina,* 918 F.2d at 985 (citing *Guerrero–Guerrero* at 1074) ("it is extremely unlikely that a vessel with cargo of contraband worth millions of dollars would be entrusted to a captain who was unaware of the nature of the cargo.")

Second, the jury could have reasonably concluded that the defendants did not set forth a convincing legitimate purpose for the ship's voyage. *See Robinson,* 843 F.2d at 9. Although the defendants claimed that their purpose for the voyage was to deliver the vessel to St. Martin, the vessel did not appear to be in a marketable condition. Its deck was rotting. Its walls were covered with peeling paint. And its engine was in a state of such disrepair that it ceased functioning before reaching port.[4] The jury could have concluded that the vessel's shabby condition indicated that it was not intended for its alleged legitimate purpose and that anyone that crewed aboard it did not have any intention of participating in a legitimate venture. *Accord Guerrero–Guerrero,* 776 F.2d at 1075 ("the jury might have thought that smugglers, aware of the risks of the ship's capture and confiscation, are more likely that 'legitimate' commercial shippers to use such a run-down boat.") Furthermore, if the jury felt that the defendants' alleged purpose was not credible and instead the result of fabrication by the defendants, such a conclusion by the jury can serve as additional evidence of guilt. *Accord United States v. López,* 709 F.2d at 747; *United States v. Smith,* 680 F.2d at 260.

Third, as a result of their interaction with the U.S.S. Biddle, the defendants acted or failed to act in a fashion that the jury could have concluded indicated a scheme to avoid detection of a clandestine venture. The jury could have concluded that the vessel's change of course after its first encounter with the Biddle was made out of a fear that its illicit cargo would be discovered. *See United States v. Leuro–Rosas,* 952 F.2d 616 (1st Cir.1991) (fact that ships changed course after being spotted by the Coast Guard is evidence of guilty). The jury could also have concluded that the vessel's failure to respond to radio calls transmitted in both English and Spanish provided additional proof that the crew feared detection. *See United States v. Piedrahita–Santiago,* 931 F.2d 127, 131 (1st Cir.1991) (citing *Beltrán,* 761 F.2d at 7) ("[f]ailure to respond to radio calls, coupled with evasive maneuvering, implies knowledge of wrongdoing.")[5]

Finally, the jury could have reasonably inferred from the videotape which was shown to them, which illustrated how the contraband could be easily off-loaded by a small group of individuals, that the crew had the dual responsibility of hauling or retrieving the cocaine from the engine beams and thereby helping to facilitate its distribution.

Defendants have argued vigorously that since the contraband was odorless, carefully hidden and inaccessible to the crew the reasonableness of any inference of knowledge on their part is undermined.[6] Defen-

---

4. In addition, the crew stated that the origin of their trip was Colombia, a known drug-source country. At least one recent First Circuit case has suggested that this fact may be evidence of guilt. *Accord United States v. Leuro–Rosas,* 952 F.2d 616, 622 (1st Cir.1991) (fact that vessel sailed from a known drug port in Colombia is evidence of guilt).

5. The jury could also reasonably concluded that the fact that the crew of the FL 8304 EM were to monitor a certain radio frequency and only speak after hearing the words "Rojo, Rojo" was similarly indicative of an attempt to cover up their illicit activities.

6. Defendants have consistently relied on the opinion of Judge Gierbolini in *United States v. Leuro–Rosas,* slip op. no. 89–330(GG) (D. Puerto

Rico Feb. 15, 1991), for the proposition that where cocaine is well-concealed and not tampered with aboard a vessel which appeared to have a legitimate purpose a jury cannot, based on such evidence, reasonably find that any crew member aboard the vessel was anything more than an "innocent hired hand." Defendants' reliance is misplaced, however, since the facts in *Leuro–Rosas* are distinguishable from those in this case. First, although Judge Gierbolini did not mention the size of the vessel in *Leuro–Rosas,* it appears to have been larger than the FL 8304 EM so that the presumption of knowledge derived from the closeness of the crew was undercut. Second, the *Leuro–Rosas* holding relied heavily on the vessel's apparently legitimate purpose, where in this case, as previously discussed, the jury could have easily concluded

dants alert the Court to the fact that a six-day destructive search of the vessel was required to uncover the cocaine. While it is true that several of the cases that have found crew members guilty of drug smuggling rely on the fact that the contraband was in a location in which the crew could reasonably have been expected to have discovered it during the voyage (*see, e.g., Guerrero–Guerrero,* 776 F.2d at 1074), or that it emitted an odor such that the crew should have known the nature of the cargo (*see, e.g., Beltrán,* 761 F.2d at 7; *Luciano Pacheco,* 794 F.2d at 11), the Court finds that these facts do not undermine all other inferences pointing to guilty knowledge. *See Robinson,* 843 F.2d at 9 (odor need not be present when other factors sufficient to infer knowledge). In applying the various factors deemed relevant in determining whether knowledge could reasonably be inferred, "[t]he issue ... is not whether one particular indication of knowledge ... did, or did not, exist." *Id.* Instead, the court must view the evidence as a whole. Given the facts and inferences discussed above, as well as other facts and inferences of lesser weight,[7] the Court finds that the jury's conclusion that the government proved each part of its case as to each defendant is supported by the facts, and their reasonable inferences, in this case.[8]

## B. Jury Speculation

■ Defendants' second ground for acquittal is based on the following theory. Since the jury was presented with insufficient evidence, it found defendants guilty solely on the basis of inappropriate speculation which grew out of information culled from the two *San Juan Star* newspaper articles. Defendants request that the allegedly speculative and tainted verdicts be overturned. *See United States v. Herberman,* 583 F.2d 222 (5th Cir.1978) (motion for acquittal must be granted where evidence so scant that jury could only speculate as to defendant's guilt); *United States v. Fearn,* 589 F.2d 1316 (7th Cir. 1978) (conviction reversed where evidence so scant jury could only speculate as to defendant's guilt). Given the Court's finding in Part II.A. of this opinion that the evidence presented at trial *was* sufficient to find defendants guilty, a lengthy review of their second challenge is unnecessary. The following discussion is included, however, to point out the inconsistencies and obvious frailties of their argument.

Defendants' theory appears to be based on the following facts and inferences. Molina was the only defendant represented by a public defender. This fact was made clear to the jury because during the trial Molina's attorney wore a type of personal identification pass issued to all public defenders and court personnel, while the attorneys for the other defendants wore distinctive pink "visitor" passes. The jury became aware of the information contained in the articles in the *San Juan Star,* including the comments of the federal judge, which suggested that individuals unable to afford private counsel received lesser legal representation than those able to "pay a lawyer $100,000." The jury, as reflected in the note it sent to the Court early Monday morning, considered and drew conclusions as to which defendants could afford to retain private counsel. The jury then spec-

that the alleged legitimate purpose of the FL 8304 EM was a fabrication.

7. For example, the evidence showed that the contraband was hidden in fiberglass beams in the hull of the ship and the various searches of the ship uncovered a drilling tool and fiberglass shavings in one of the cushions upon which the crew slept. The jury could have concluded from this evidence that the crew was involved in the loading of the contraband into the beams.

8. The Court notes that, in addition to the factor mentioned previously (*see* text *supra* at 11), other evidence adduced at trial reinforced the government's case as to defendant Cardona. First, a heightened presumption of knowledge exists where the defendant is the captain of the vessel, since "[a] captain normally knows what his ship contains." *Guerrero–Guerrero,* 776 F.2d at 1071. Second, the jury could have inferred from the false statement that Cardona gave regarding the true owner of the vessel that his misstatement to the authorities suggest that he had knowledge of his illegal cargo. *See Luciano Pacheco,* 794 F.2d at 11 (inference of guilty knowledge may be based on captain or crew's providing false or conflicting answers to questions posed regarding the vessel, cargo, or crew).

ulated that the defendants able to afford private counsel were able to do so because of the money they received from trafficking in narcotics. This assumption was reinforced by distorted testimony concerning the amount of money received by the defendants. The jury then, without any other sufficient evidence, found these defendants guilty.

Defendants' contention is not only wildly speculative as to the jury's reasoning but is also factually and legally flawed in several respects. Defendants claim that the testimony regarding the amounts received by Cardona and Rojano made it appear that they were paid a great deal of money for the trip, since the figures provided were in terms of Colombian pesos, which are worth very little in comparison to American dollars. Defense counsel was able to elicit on cross-examination, however, that the exchange rate for Colombian pesos is very low, so that the jury was provided with adequate information on the value of the money received. Defendants further contend that the jury, after being exposed to the two newspaper articles, acquitted defendant Molina because he was the only defendant whose means were so meager that he had to be represented by a public defender. The jury was aware, however, that defendant Gómez, although not represented by a public defender, was unable to retain private counsel and instead was represented by a court-appointed attorney.[9]

Defendants assert that the Court erred in failing to *voir dire* the jury upon their return for deliberations on Monday morning and in not giving a curative instruction after receiving the note that suggested that at least one jury had read the newspaper articles. These contentions do not require extensive discussion. The jurors were instructed, using language offered by defense counsel, not to read newspapers or watch newscasts over the weekend. It is well-settled that jurors are presumed to follow the instructions of the court. *Accord United States v. Eldred*, 588 F.2d 746, 752 (9th Cir.1978) (incorporating *Cavness v. United States*, 187 F.2d 719, 722 (9th Cir.1951)) ("faithful performance of [jurors'] official duties are presumed.") Although this is a rebuttable presumption, prejudice should be demonstrated by the defendant "by a preponderance of the credible evidence." *United States v. Winkle*, 587 F.2d 705, 714 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Defendants did not satisfy this burden when they brought to the Court's attention two newspaper articles, which are similar to many that appear regularly in local newspapers and which made no reference to the instant case. Finally, a curative instruction was in fact administered by the Court after the jury submitted its note asking which defendants were represented by public defenders. The Court instructed the jury that whether a defendant was retained by a defendant or appointed by the Court was not to be considered in their deliberations. Defendants have not set forth sufficient evidence to show that this instruction was not adequate or not followed by the jury.[10]

9. In addition, neither of the newspaper articles would necessarily have led the jury to conclude that defendants able to afford private counsel are most likely drug traffickers. The article that discussed how some individuals are unable to afford private counsel and therefore may receive substandard representation does not suggest the reverse—that individuals able to afford private counsel receive outstanding legal representation that may allow them to beat the system. Therefore, even if a juror had read the article, he or she would not have been encouraged to find a defendant guilty merely because of the high quality of his legal representation.

10. Defendants suggest that the jury *must* have considered this issue since no other distinction existed between Molina and the other defendants upon which the jury could have singled him out to be acquitted. This is not so. Aside from any conclusions the jury might have drawn regarding Molina's demeanor during the trial, the evidence showed that at least two of the convicted defendants were paid for their work while no evidence was offered as to whether Molina received any compensation for the trip.

As for the fact that no evidence was received that defendant Gómez received any money and he was found guilty, any argument based on this condition highlights defendants' essential difficulty in this case. They argue that they were convicted based on speculation by the jury as to their guilt but point only to evidence that shows only that the jury might have speculated as to defendant Molina's innocence. Unfortu-

## III. Conclusion

The evidence adduced at trial, along with all reasonable inferences, was sufficient to support the jury's verdict of guilty as to the defendants. The jury did not, therefore, merely speculate as to defendant's guilt. Defendants' motion for judgment of acquittal is therefore DENIED.

IT IS SO ORDERED.

nately for them, it is not possible to convert the fact that the jury, for whatever reason, found Molina not guilty, into a conclusion that they deserved the same treatment.