776 F.2d 1071
 UNITED STATES, Appellee,
v.
Hector Mario GUERRERO-GUERRERO, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Diafanor Mosquera, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Jesus Idelfonso-Ortiz, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Juan de Dios Cabeza-Mejia, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Orlando Porras-Flores, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Dunoy Torres-Paternina, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Arnulfo Valencia-Aspirilla, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Felix Chica-Castano, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Cresenciano Vazquez-Consuegra, Defendant, Appellant.
UNITED STATES, Appellee,
v.
Jane DOE, a/k/a Julie Guerrero-Soto, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Rafael Perez, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Silvio Ferrin-Molineros, Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Heriberto Enrique Mendibil-Manjarrez,
Defendant, Appellant.
UNITED STATES, Appellee,
v.
John DOE, a/k/a Juan Alejandro-Sisa, Defendant, Appellant.
 Nos. 84-1904 and 84-1941 to 84-1953.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 9, 1985.
Decided Nov. 15, 1985.
 
 Francisco M. Dolz Sanchez, San Juan, P.R., for appellant Guerrero-guerrero.
 David W. Roman, First Asst. Federal Public Defender, with whom Gerardo Ortiz Del Rivero, Federal Public Defender, San Juan, P.R., was on brief, for appellants Mosquera, Cabeza-Mejia, Porras-Flores, Torres-Paternina, Valencia-Aspirilla, Chica-Castano, Vazquez-Consuegra, Guerrero-Soto, Perez, Ferrin-Molineros, Mendibil-Manjarrez and Alejandro-Sisa.
 Harry R. Segarra Arroyo, Santurce, P.R., by appointment of the Court, for appellant Idelfonso-Ortiz.
 Charles E. Fitzwilliam, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., San Juan, P.R., was on brief, for appellee.
 Before COFFIN, Circuit Judge, WISDOM,* Senior Circuit Judge, and BREYER, Circuit Judge.
 BREYER, Circuit Judge.
 
 
 1
 The captain and thirteen crew members of the ship STECARIKA appeal from their convictions for possessing marijuana with an intent to distribute it and import it into the United States. See 21 U.S.C. Sec. 955a(c), (d)(1), (f); 18 U.S.C. Sec. 2. They basically claim the evidence was insufficient to support an inference necessary to a verdict of 'guilty,' namely, that they knew their ship contained the 22,000 pounds of marijuana that customs officials found aboard it. After reviewing the record evidence in a light most favorable to the government, see United States v. Quejada-Zurique, 708 F.2d 857, 859 (1st Cir.), cert. denied, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983), we find it sufficient to allow a reasonable juror to find guilt beyond a reasonable doubt, see id. Rephrasing this legal conclusion with the caution that the record warrants, we do not believe we can set aside this verdict without impermissibly invading that province of factfinding and commonsense inference that the law reserves to a jury. A review of the evidence will help explain both our caution and our conclusion.
 
 
 2
 1. On June 18, 1984, a Coast Guard cutter, the DALLAS, while cruising the high seas south of Puerto Rico, found the STECARIKA lying dead in the water, tethered to a stationary sailing vessel, the ESPERANZA. Guerrero, the STECARIKA's captain, gave the Coast Guard permission to board. The boarding party first conducted a "personnel sweep"--a quick walk through the vessel to make sure everyone on board knew the Coast Guard was present. The Coast Guard officers noticed that the two cargo decks, running virtually the whole length and breadth of the ship, were empty. On the lower cargo deck, however, they noticed a smell of marijuana--a smell one of them described as "noticeable" and another as "very faint."
 
 
 3
 They went back up to the bridge area of the ship and, with an interpreter's help, questioned the captain and examined the ship's documents. They learned the STECARIKA had sailed from Cartagena, Colombia, with a crew of fourteen on June 2, 1984. It contained no cargo. The captain said he was sailing to Savannah, Georgia, where he would pick up a cargo for transport to the Virgin Islands. He said he did not know the nature of the cargo, or who in Savannah would supply it. He added that the ship had broken down six or seven days earlier, and that about three days earlier, he had called the ESPERANZA for assistance. The papers revealed that the STECARIKA is 317 feet long, that it has two cargo decks (vast empty spaces) which together can accommodate about 1600 tons of cargo, that the size of the crew (fourteen) was no larger than normal for the ship, and that the crew members had signed on board on May 30, 1984.
 
 
 4
 The captain then led the Coast Guard on a more thorough tour of the STECARIKA. The officers found it dirty and run-down. They found the crew's gear strewn about the various staterooms on the main deck, and a mattress on the bridge. They found the single wooden lifeboat unusable, and noticed that the cargo loading booms and winches were rusted and probably would not work.
 
 
 5
 Upon reaching the second (lower) cargo deck, the Coast Guard officers approached the forward wall and asked what lay on the other side. The captain said he was unsure, but it might be a water tank. One of the officers noticed a valve on the wall, which he opened. At that point, the smell of marijuana, which had previously seemed "noticeable," suddenly became "much more noticeable." When questioned further, the captain summoned Juan Alejandro-Sisa, the ship's chief mechanic (and another defendant here), who told the officers that there was nothing on the other side of the wall. The officers were unable to find out from either man how to get into the room behind the wall. They then brought on board a device called a boroscope that allowed them to peer through the valve hole; they detected burlap fibers inside the room.
 
 
 6
 Informed of this discovery, Captain Guerrero told the officers they would have to leave. But, by this time, the Coast Guard had received permission to search the ship from Great Britain, its country of registry, so they continued the search. And, to make a long story short, they eventually managed to extract a small amount of marijuana through the valve hole. They arrested captain and crew, and took the ship to Puerto Rico.
 
 
 7
 Customs officials in Puerto Rico located the entrance to the room--a hatch on the floor of the first (upper) cargo deck that had been sealed with a putty-like substance. Removing the hatch, they found a ladder descending into a room that houses the ship's 'bow thruster' apparatus--equipment that moves the bow sideways when the ship is entering or leaving port. The room contained 347 sacks of marijuana, each apparently measuring about 27 inches by 14 inches by 12 inches, and which must have contained on average about 65 pounds of marijuana each, or 22,000 pounds altogether. Diagrams of the ship suggest the room was about eleven feet high and nine feet wide, and it must have been eight or more feet long. An air vent ran from the room to the ship's main deck.
 
 
 8
 After considering this and other evidence, and after taking a tour of the ship itself, the jury convicted all defendants--thirteen crew members and the captain--on both counts. (The fourteenth crew member had previously pleaded guilty to the charge of possession with intent to distribute; the importation charge against him was dropped.)
 
 
 9
 2. The critical question before us is whether a reasonable juror could conclude, beyond a reasonable doubt, that each of these defendants knew the STECARIKA contained marijuana. We do not find this question difficult in respect to the captain. The jury might have reasoned that a captain normally knows what his ship contains, at least in a relatively significant room such as that containing the bow thruster machinery. See United States v. Elkins, 774 F.2d 530, 539 (1st Cir.1985); United States v. Willis, 639 F.2d 1335, 1339 (5th Cir. Unit A 1981). Additional support for the jury's inference of guilty knowledge comes from the captain's assertion that he did not know who would supply him with cargo in Savannah or what the cargo was, from his false statement that the room in front of the cargo-deck wall contained water, and from his abrupt termination of the Coast Guard search once the officers learned the room did not contain water. Similarly, there was 'special' evidence of the guilt of the chief mechanic, who told the Coast Guard that "nothing" lay beyond the wall. But, what about the other members of the crew--the oilers, the ordinary sailors, the cook--who neither testified at trial nor were mentioned specifically by the government's witnesses?
 
 
 10
 In our view, the following facts and accompanying inferences, when taken together, support the conclusion that these defendants did possess the requisite knowledge. To begin with, the shipment was large, the voyage was long, and the marijuana was perceptible (through at least a "faint" or "noticeable" odor) to persons on board. The jurors might reasonably have believed that smugglers simply would not have tried to import 22,000 pounds of marijuana, worth millions of dollars, without assuring themselves of the 'reliability' of the crew, when the smell of marijuana could have been detected on the cargo deck or possibly through an air vent linking the main deck with the room containing the marijuana, and when the crew would be together at sea for quite a few days.
 
 
 11
 Second, the marijuana was stashed inside the room that houses the STECARIKA's bow thruster. The appellants argue that the smugglers put the marijuana there in order to conceal it from the crew, whose quarters were some distance from the room. The jury, however, could have reasoned that if the smugglers had been intent on hiding the contraband from the crew, they would not have put it in a room containing equipment that the crew might have occasion to inspect or repair sometime during the voyage. This inference seems reasonable in light of (1) the testimony that it is standard procedure to enter the bow thruster room in order to check a ship's "operational readiness," (2) the evidence that the ship was dilapidated and in frequent need of repair, and (3) the fact that the entrance to the room was sealed shut with putty alone. In addition, the captain reportedly told the Coast Guard that the STECARIKA's bow "had work done from the time [the ship] left Colombia." Thus, the jurors might have seen the 'concealment' of the marijuana not as an effort to hide it from those aboard the STECARIKA, but rather as a precaution taken in case of a search by the Coast Guard.
 
 
 12
 Third, the jury saw the ship and heard testimony about the conditions aboard it. The quarters were shabby, the lifeboat inadequate, the booms and winches rusted, and the engines broken. In the words of the district judge who accompanied them on their tour, the jurors could have reasoned that the STECARIKA "was not in any condition or intended to carry regular cargo and that anyone that crewed aboard it did not have any intention of participating in a regular cargo venture." That is to say, the jury might have thought that smugglers, aware of the risks of the ship's capture and confiscation, are more likely than 'legitimate' commercial shippers to use such a run-down boat. And, it might have thought that the crew would likely have had at least a vaguely similar idea of the relationship between the quality of a ship's conditions and the nature of its mission.
 
 
 13
 Fourth, the boat was carrying 347 65-pound sacks in a room near the bottom of the boat and accessible only by a single ladder. Unloading these sacks in Savannah would have taken considerable time and effort, not to mention guile. The jury might have inferred that the smugglers were counting on the crew to perform this necessarily clandestine operation rather than planning to assemble an outside group to do the work without arousing suspicion among the 'unwitting' regular crew.
 
 
 14
 Fifth, the STECARIKA lay dead in the water for at least three days before anyone called for help. The jury might have considered this a further token of the crew members' knowledge that they were involved in an illicit enterprise.
 
 
 15
 Finally, the preceding five sets of inferences are mutually reinforcing, or at least mutually consistent. Thus, a juror might have reasoned that all of them, taken together, remove a reasonable doubt.
 
 
 16
 One's belief in the strength of these inferences, even when taken together, depends, of course, upon the degree to which one shares certain common-sense notions about human behavior. How cautious are big-time smugglers actually likely to be? How certain is it that smugglers trying to hide marijuana from a crew would make sure no odors were evident on board? To what extent are crew members likely to move about a large, empty ship, to gossip, to share experience, when together at sea for sixteen days? Reasonable people might have different views about the correct answers to these questions about human behavior. Our system, however, gives jurors, not judges, the responsibility for formulating such views and answering such questions. It does so, not because jurors have expert knowledge about smugglers or because they have the 'true' answers, but rather because jurors are more likely than judges to come up with answers that reflect the common-sense view of the community. And, as case law makes clear, we must accept the jury's answers unless unreasonable. Thus, we have said that the evidence need not preclude every reasonable hypothesis inconsistent with guilt; and we have added that the jury is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is reasonable. See Quejada-Zurique, 708 F.2d at 859; United States v. Smith, 680 F.2d 255, 259 (1st Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). Here, the common-sense inferences necessary to find "no reasonable doubt" are themselves reasonable. We therefore cannot set aside the jury's verdict without impermissibly intruding into an area of judgment that does not belong to us.
 
 
 17
 3. Prior case law also suggests that the evidence here is sufficient to support guilty verdicts. The evidence is stronger than that presented in two cases in which this circuit reversed the convictions of people on board a ship carrying contraband. See United States v. Mehtala, 578 F.2d 6 (1st Cir.1978); United States v. Francomano, 554 F.2d 483 (1st Cir.1977). Both of those cases arose out of the seizure of a 70-foot schooner that had apparently been carrying about fifty pounds of marijuana, together with about 2,250 pounds of coffee and 2,000 pounds of sugar. In Mehtala, the court found virtually no evidence that a woman apparently on board the schooner for a "pleasure cruise" had done anything to help the drug smuggling conspiracy. 578 F.2d at 9-10. In Francomano, the court found inadequate evidence of guilty knowledge on the part of four crew members, see 554 F.2d at 486-88, who were described by the court as "young men, short of funds, seeking travel for educational experience and adventure," id. at 486, and some of whom had trouble communicating with other people on board because of language differences, see id. at 487. In light of the evidence that the defendants were on board for pleasure and adventure, that they had trouble communicating with each other, and that the ship carried only fifty pounds of marijuana of comparatively small value and which could have been readily concealed amid the other two tons of cargo, Mehtala and Francomano do not control the case before us. See United States v. Lopez, 709 F.2d 742, 747 n. 5 (1st Cir.), cert. denied, 464 U.S. 861, 103 S.Ct. 187, 78 L.Ed.2d 166 (1983). Moreover, the fact that the yacht's illicit fifty-pound cargo was of comparatively little value means there was correspondingly little basis in these cases for crediting one of the several, mutually reinforcing, inferences we have deemed reasonable here--that conspirators conducting a lengthy, high-stakes smuggling operation would not allow the presence of unwitting bystanders in their midst. See United States v. Beltran, 761 F.2d 1, 6 (1st Cir.1985).
 
 
 18
 The evidence here is also stronger than that found insufficient in United States v. Bland, 653 F.2d 989 (5th Cir. Unit A), cert. denied, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981). In Bland, a tugboat towing a barge laden with marijuana had sailed from Miami to a secluded spot in the Gulf of Mexico, where it met up with a yacht that had sailed from the Louisiana coast. The court, in finding the evidence insufficient to support the convictions of the tugboat's crew members, stressed that the eighteen tons of marijuana had been sealed away inside the barge's hold, that the hatches leading to the hold had apparently not been uncovered during the voyage, and that there had been no noticeable odor of marijuana while the hatches remained closed. See id. at 992-94; cf. Elkins, 774 F.2d at 538, 539 n. 6. In addition, the tugboat's voyage seems to have been considerably shorter than the STECARIKA's, and there was apparently no evidence that either the tug or barge was in a state of disarray or disrepair, or that the tugboat's crew would have had reason to visit the barge's hold during the voyage.
 
 
 19
 The evidence here more closely resembles that in several cases upholding guilty verdicts. In Lopez, supra, for example, this court upheld the convictions of crew members of a 72-foot boat that sailed some 2,000 miles with fourteen tons of marijuana aboard, despite evidence that the marijuana had been kept out of sight in the hold and that no odor was detectable as long as the hold remained closed. See 709 F.2d at 746-48. The court emphasized the likelihood that the eight-member crew would have been used to unload the ship, stating:
 
 
 20
 [T]he large quantity of marijuana, the presence of so many men on board, and the obvious fact that the [ship] could only be unloaded clandestinely, suggested that the crew's duties would include offloading the marijuana. A jury could believe it highly unlikely that persons expected to assist in such an activity would be kept in the dark as to the vessel's purpose.
 
 
 21
 Id. at 748.
 
 
 22
 In Beltran, supra, this court upheld the convictions of crew members who spent more than three weeks aboard a 160-foot ship carrying 22 tons of marijuana. See 761 F.2d at 7. Beltran does not determine the outcome here, for in that case the odor of marijuana was "detectable throughout the vessel," the crew was abnormally large, and the crew members had keys to the hold where the illicit cargo was stashed. See id. at 6-7. Yet, Beltran articulates the important point that, as a matter of "reason and common sense," a jury may infer that
 
 
 23
 conspirators engaged in conduct which, by its nature is kept a secret from outsiders, would reasonably not allow the presence of innocent bystanders in their midst while conducting a lengthy, illegal operation.
 
 
 24
 761 F.2d at 6 (characterizing holding of Smith, supra); see also United States v. Humphrey, 759 F.2d 743, 751 (9th Cir.1985) ("[G]iven the scale of the undertaking and the necessity for secrecy, 'no one would have been admitted to the enterprise who was not to be trusted completely with knowledge of its criminal character.' ") (quoting United States v. Allen, 675 F.2d 1373, 1384 (9th Cir.1980), cert. denied, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981) ).
 
 
 25
 The case law also emphasizes several factors that militate in favor of upholding these convictions. These factors include the length of the voyage, the amount of marijuana on board, the perceptibility of the marijuana, and the closeness of the relationship among the captain and crew (i.e., between those with 'special reason to know' and others). See Elkins, 774 F.2d at 538 n. 6; Beltran, 761 F.2d at 6; United States v. Del Prado-Montero, 740 F.2d 113, 115 (1st Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 441, 83 L.Ed.2d 366 (1984), --- U.S. ----, 105 S.Ct. 527, 83 L.Ed.2d 415 (1984), --- U.S. ----, 105 S.Ct. 924, 83 L.Ed.2d 936 (1985); Quejada-Zurique, 708 F.2d at 860; Smith, 680 F.2d at 260; Cf. United States v. Loalza-Vasquez, 735 F.2d 153, 158-59 (5th Cir.1984) ("[E]vidence of a voyage by sea in a small vessel for at least 6 or 7 days duration with approximately 36,000 pounds of marijuana aboard is sufficient for a reasonable trier of fact to find ... more than mere presence ....").
 
 
 26
 In sum, although our prior cases present differing factual patterns that make it impossible for us to call them "dispositive" here, we think the factual pattern before us more closely resembles the cases upholding guilty verdicts than those striking them down.
 
 
 27
 4. The appellants raise one further point. During the course of the jury's deliberations, the forewoman sent the judge a note asking him to explain why the defendants had not testified at trial. The judge, after consulting counsel for both sides about how to proceed, called the jurors back to the courtroom and repeated his earlier instruction:
 
 
 28
 Remember that a defendant has an absolute right not to testify. The fact that he or she did not testify should not be considered by you in any way or even discussed in your deliberations. I will remind you that it's up to the government to prove a defendant is guilty beyond a reasonable doubt. It's not up to any defendant to prove that he or she is innocent.
 
 
 29
 The appellants argue that the forewoman's note demonstrates that the jury had a reasonable doubt about the defendants' guilt. We disagree. The most the note indicates is that some of the jurors were confused as to why the defendants did not testify in their own behalf; the trial judge's repeated instruction left no doubt as to whether the jurors were permitted to infer guilt from the defendant's silence. The judge in this case issued a clear and concedely valid instruction not once but twice, and we see no reason to retreat from the usual presumption that the jury acted as instructed. See Shotwell Manufacturing Co. v. United States, 371 U.S. 341, 366-67, 83 S.Ct. 448, 463, 9 L.Ed.2d 357 (1963).
 
 
 30
 For these reasons, the judgment of the district court is
 
 
 31
 Affirmed.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation