**Emiro PASSOS–PATERNINA, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Civil No. 97–1137(JP).**

United States District Court, D. Puerto Rico.

June 26, 1998.

Emiro Passos–Paternina, Fort Dix, NJ, pro se.

Assistant U.S. Attorney, Hato Rey, PR, for Defendant.

### OPINION AND ORDER

PIERAS, District Judge.

## I. INTRODUCTION

Alleging that he was denied his constitutional right to effective assistance of counsel, Petitioner now moves this Court under 28 U.S.C. § 2255 to set aside his conviction. Specifically, Petitioner asserts that his lawyer (1) failed to investigate and/or adduce evidence demonstrating Petitioner's role (or lack thereof) in the offense and (2) undermined Petitioner's right to testify on his own behalf. The Court recites the facts from the United States Court of Appeals for the First Circuit's opinion affirming Petitioner's conviction:

> The night of September 3, 1988 was dark and stormy as United States Coast Guard Cutter NUNIVAK went about a routine patrol of the Caribbean waters in and around the Virgin Islands. Several miles south of the island of St. John, a lookout on the NUNIVAK sighted the lights of a vessel some seven miles distant. As the NUNIVAK approached, the lights of the other vessel could no longer be seen, though radar contact was maintained except when obstructed by rising swells in the worsening storm. Approximately forty minutes later the NUNIVAK's searchlight serendipitously illuminated a flagless vessel, her stern bearing the name SHEME but no homeport designation. NUNIVAK attempted radio contact in Spanish and English, but no response penetrated the stormy ether. Instead, the SHEME changed course and began criss-crossing NUNIVAK's bow, nearly occasioning a collision.

> Finally, the voice of SHEME's master was heard over NUNIVAK's radio: "Llamando el barco Americano"—"Calling the American ship." Lieutenant Donovan, deck watch officer aboard the NUNIVAK, asked for the official name of the vessel, its last port of call, its next port of call, the number of persons on board, and the type of cargo. The master responded that SHEME's last port of call had been Barranquilla, Colombia, five persons were on board, all Colombian citizens, and that SHEME carried no cargo, as she was en route to Tortola, in the British Virgin Islands, for sale to a new owner. When Lt. Donovan requested SHEME's registration number, the master responded that he was not its owner and would not be able to provide the registration number until he contacted his agent in Colombia the next morning. The master refused to consent to boarding. Lt. Donovan testified that at some point during their radio communications the master stated that the SHEME was a Colombian vessel.

> Around midnight the NUNIVAK received permission from Coast Guard headquarters in San Juan to board the SHEME without its consent. The SHEME refused to respond to Lt. Donovan's entreaties to heave to so as to permit a safe boarding in the stormy seas. The NUNIVAK sounded general quarters, manned its guns, and fired across SHEME's bow. The SHEME hove to.

> Prior to the boarding, Lt. Donovan instructed SHEME to muster all personnel at her stern. The master stated that SHEME was a Panamanian vessel, again advising that he did not consent to the boarding and wished to contact his agent in Barranquilla in the morning.

> The Coast Guardsmen proceeded to board. As Lt. Donovan and five armed seamen came over the gunwales, SHEME's crew was nowhere to be seen. As the boarding party cautiously began to explore the vessel, they came upon four crew members in the cabin wiping copious quantities of grease from their bodies. There were two flags—Colombian and Panamanian—in the cabin. The master was in the pilothouse, near the radio. The master presented Lt. Donovan with an expired Panamanian vessel registration, giving Barranquilla as its homeport, and papers identifying each crew member as a Colombian citizen.

A preliminary search disclosed no contraband. The vessel was shipshape throughout, except for the grease-covered inspection plates on the fresh-water drinking tanks. The boarding party proceeded to open one of the inspection plates and found that the tanks were filled with water. While removing the plate, however, the Coast Guardsmen noticed another inspection plate, previously overlooked, located on a bulkhead originally believed to be the inner wall of the SHEME's transom. The plate was heavily laden with grease, several bolts were loose and several were missing. The removal of the inspection plate exposed a hidden storage compartment, containing nearly four hundred styrofoam containers wrapped in green tape; some had been opened and emptied. The white crystalline contents from one package field-tested as cocaine. Later chemical analysis indicated that the entire cocaine cargo consisted of 386.2 kilograms of 94 percent pure cocaine.

*United States v. Passos–Paternina*, 918 F.2d 979, 980–81 (1st Cir.1990).

## II. ANALYSIS

### A. FAILURE TO INVESTIGATE AND/OR ADDUCE EVIDENCE

█ In Petitioner's eyes, the government's case against him depended primarily upon the grease that linked the crewmembers to the secret compartment and, thereby, to the cocaine. Indeed, the First Circuit relied heavily on the grease connection in affirming Petitioner's conviction and rejecting his argument that the government had failed to adduce sufficient evidence to support his conviction. *See id.* at 986. Petitioner argues that his lawyer failed to investigate his claims that the "grease" found on his clothes was not the same "grease" found on the other crew members. Petitioner posits the following scenario: He is a diesel mechanic; he was hired solely to keep the SHEME's engines ship-shape. On the night of September 3, the SHEME's engines were malfunctioning. Petitioner, as the ship's mechanic, was down in the engine room making repairs. It was while he was in the engine room that the other crew members were attempting to

conceal the contraband. As a result of being in the engine rooms, Petitioner was befouled by engine oil and grime, not with the grease found on the other defendants and used by the government to link the crew members to the contraband. Moreover, because Petitioner was below in the engine room when the Coast Guard boarded the SHEME, he came on deck only after hearing a commotion and only to determine what was causing that commotion. Only after the Coast Guard officers confronted him and ordered him to the stern did he proceed to clean the engine oil and grease from his hands. Petitioner maintains that an investigation of this story would have uncovered exculpatory evidence "delinking" him from the tell-tale grease. Specifically, his attorney should have obtained an analysis of Petitioner's clothing to demonstrate that it was covered with engine oil, not grease, and he should have verified that the engine had been repaired just prior to the Coast Guard boarding. According to Petitioner, his counsel's failure to procure the analysis of his clothes and/or to verify that the SHEME's engines had just been repaired "prevented [Petitioner] from explaining his presence and [providing] powerful evidence [that Petitioner] was not amongst those attempting to remove, conceal, or destroy the contraband prior to the arrival of the authorities."

█ Petitioner's ineffective assistance claim regarding his attorney's failure to investigate must be analyzed under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to sustain a claim of ineffective assistance under *Strickland*'s two-prong test, Petitioner must demonstrate first, that his attorney's performance was deficient, and second, that the deficiency in his attorney's performance prejudiced his defense. 466 U.S. at 687, 104 S.Ct. 2052. In considering *Strickland*'s first prong, the habeas court must remember that although the Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel, *id.*, it "does not guarantee a defendant a letter-perfect defense or a successful defense; rather the performance standard is that of reasonably effective assistance under the circumstances then obtain-

ing." *Lema v. United States*, 987 F.2d 48, 51 (1st Cir.1993) (quotations and citations omitted). As the *Lema* court explained:

> "The habeas court must evaluate the challenged conduct from counsel's perspective at the time [citations omitted], considering the totality of the circumstances before it [citations omitted], and making every effort to eliminate the distorting effects of hindsight. [citations omitted]. It must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." [citations omitted].

*Id.*

"The Court finds [1] that Petitioner has failed to rebut the 'strong presumption' that his attorney's decision not to conduct a chemical analysis of the substances found on Petitioner's clothing and not to inspect the SHEME's engines fell within the wide range of reasonable professional assistance. As the Supreme Court observed in *Strickland*, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary ... a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 690–91, 104 S.Ct. 2052. In the case at bar, all five defendants pursued the same defense based on the premise that the government could not prove each element of its case beyond a reasonable doubt. All five defendants disputed knowing that the cocaine was aboard the vessel and argued that the government failed to adduce evidence from which a jury could find that requisite element of the crime. By the time of Petitioner's trial, the jurisprudence in this circuit clearly required the government to establish more than mere presence aboard a vessel in which contraband is being carried to convict on a charge of aiding and abetting the possession of a controlled substance with the intent to distribute it. *See Passos–Paternina*, 918 F.2d at 984. Given the weakness of the government's case pertaining to each defendant's knowledge, the tactical decision to pursue that defense was reasonable. Indeed, Petitioner does not contend that defense was inappropriate; rather, he argues that the evidence his attorney would have obtained from further investigation would have bolstered that defense. But, where the government's case is so weak, counsel might reasonably determine that the best prospect for acquittal was not in "presenting additional [evidence] which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence." *Lema*, 987 F.2d at 54. Regardless of whether counsel's decision was correct in retrospect, the Court can hardly question his tactical decision to rest on the weakness of the government's case. As the court of appeals noted, the jury was forced to rely on very circumstantial evidence to find the requisite *scienter*. *Id.* at 984–86.

Competent defense counsel must always consider that an investigation of the type allegedly requested by Petitioner—chemical analysis and/or mechanical inspection—will not yield favorable results, but will instead lend support to the government's case. Competent counsel must then weigh the potential gains against the potential detriments of obtaining such evidence.

Here, the potential gains were questionable. First, as noted, the government's case was already very weak, so counsel might reasonably have considered that the evidence might not even be necessary.

---

1. "The burden is on the petitioner to demonstrate ineffective assistance by a preponderance of the evidence. [citations omitted]. Where a petition (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case, [citations omitted], summary dismissal is appropriate. Even a section 2255 petition predicated on specific assertions of fact allegedly supported in the record may be dismissed summarily by the district Court, [citations omitted], provided the district court can test the allegations by assuming *arguendo* their truth, and then assessing their sufficiency in light of the relevant constitutional standards and the record. [citations omitted]." *Lema v. United States*, 987 F.2d 48, 51–52 (1st Cir.1993).

Second, counsel might reasonably have doubted the probative value of such evidence. The First Circuit and other courts have frequently been called upon to consider the link between a ship's crewmembers and its contraband cargo. *E.g. United States v. Guerrero–Guerrero,* 776 F.2d 1071 (1st Cir.1985); *United States v. Sandoval,* 787 F.Supp. 275, 278–79 (D.Puerto Rico 1992). For example, in *Guerrero–Guerrero,* the First Circuit analyzed a similar case against crewmembers aboard a large ship carrying marijuana. The court upheld the crewmembers' convictions even though the government had failed to produce direct evidence linking the crew to the contraband. In affirming their convictions, the First Circuit analyzed and listed various circumstantial considerations from which a jury could rationally have linked the crew members to contraband cargo.[2] Petitioner's counsel, as well as counsel for Petitioner's codefendants, reasonably focused on distinguishing the *Guerrero–Guerrero* case and other, similar cases from their clients'. Prior to trial and in light of the focus reasonably placed on circumstantial links between the defendants and the drugs, it might not have appeared to Petitioner's counsel that the grease on the defendants' clothes would prove to be the major link by which the jury would infer knowledge and intent.[3] In other words, competent counsel might not have

even considered that the issue of the grease on the defendants' clothes would be important.

Moreover, even if counsel did consider or should have considered the value of investigating the grease on Petitioner's clothing or when the SHEME's engines had last been repaired, it does not necessarily follow that the tests/investigation allegedly requested by Petitioner would have appeared necessary. At most, the evidence would only have established a tenuous inference, which the jury would have been free to disregard, that the Petitioner was working on the engine the night of September 3, 1988. In other words, even at best the investigations would not have produced any case-breaking evidence.[4] In sum, the potential gain of conducting the investigations was far from certain. Looking at the circumstances from the perspective of Petitioner's counsel prior to trial, the decision not to conduct chemical analysis tests on Petitioner's clothes or to scientifically determine whether or not the SHEME's engines had been repaired the night of the arrest was not outside the wide range of reasonable professional assistance.

Having determined that Petitioner's claims regarding his attorney's decision not to conduct certain investigations, even if believed,[5]

---

**2.** These factors include, *inter alia,* the size of the vessel, *United States v. Robinson,* 843 F.2d 1, 8 (1st Cir.1988), the condition of the vessel, *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985); the number of crew members, *United States v. Molinares Charris,* 822 F.2d 1213, 1219 (1st Cir.1987); the relationships among the crew members, *United States v. López,* 709 F.2d 742, 746–47 (1st Cir.1983); the volume of the contraband, *United States v. Corpus,* 882 F.2d 546, 550 (1st Cir.1989); the value of the contraband, *Guerrero–Guerrero,* 776 F.2d at 1074; the accessability of the contraband, *United States v. Luciano Pacheco,* 794 F.2d 7, 11 (1st Cir.1986); the odorousness of the contraband cargo, *United States v. Beltrán,* 761 F.2d 1, 7 (1st Cir.1985); and the length of the voyage, *id.* at 6–7. *United States v. Passos–Paternina,* 918 F.2d 979, 984–85 (1st Cir.1990).

**3.** In fact, no one will ever know that the grease was the "essential link" upon which the jury relied. Regardless of the reliance placed upon the grease by the First Circuit in analyzing Petitioner's sufficiency of evidence appeal, the jury might well have relied more on the *Guerrero–*

*Guerrero* factors in finding that the government established all elements of the crime.

**4.** Generally, where courts have sustained collateral attack based on claims of ineffective assistance alleging a failure to investigate, the evidence which the investigation would have allegedly procured would have made conviction nearly impossible. *E.g., Holsomback v. White,* 133 F.3d 1382 (11th Cir.1998) (failure to investigate medical evidence obtained shortly after alleged sodomization of a young boy); *Baylor v. Estelle,* 94 F.3d 1321 (9th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1329, 137 L.Ed.2d 489 (1997) (failure to obtain potentially exculpatory semen evidence).

**5.** Because the Court finds it clear that Petitioner has failed to meet *Strickland's* rigorous first prong, the Court has simply accepted the veracity of Petitioner's allegations. But his bare allegations are suspect at best. It is far too easy for a convicted defendant to come forward, many years after his case has been disposed of, and say (1) that he requested his attorney to conduct an investigation; (2) that his attorney refused; and

would fail to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, the Court will not consider whether counsel's conduct prejudiced Petitioner's defense.

## B. DENIAL OF PETITIONER'S RIGHT TO TESTIFY

 Petitioner next argues that his attorney prevented him from testifying at trial about "the circumstances surrounding his presence on the SHEME [and from explaining] his activities during the trip, and particularly on the evening of September 3, 1988." A criminal defendant has the right to testify in his own defense, *Rock v. Arkansas,* 483 U.S. 44, 49–52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); that right is personal to the defendant and may not be waived by his attorney. *Brown v. Artuz,* 124 F.3d 73, 77–78 (2nd Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1077, 140 L.Ed.2d 135 (1998) (collecting cases from all federal circuit courts of appeal that have addressed the issue); *cf. Lema,* 987 F.2d at 48 (assuming without deciding that the right to testify may not be waived by counsel). Petitioner argues that his counsel, by refusing Petitioner's repeated requests to allow him to take the stand, hampered his right to testify on his own behalf.

Courts analyzing similar claims on collateral review have taken different approaches.[6] Some, including the First Circuit, have approached the issue as a question of waiver.

Those courts have, either expressly or impliedly, placed the onus for protecting a criminal defendant's right to testify on the court, *e.g., State v. Neuman,* 179 W.Va. 580, 371 S.E.2d 77, 81–82 (1988); *People v. Curtis,* 681 P.2d 504, 514 (Colo.1984); . *Culberson v. State,* 412 So.2d 1184, 1186–87 (Miss.1982); *cf. Jordan v. Hargett,* 34 F.3d 310, 314–15 (5th Cir.1994), the defendant's attorney, *e.g., Brown,* 124 F.3d at 79–80; *United States v. Teague,* 953 F.2d 1525, 1534 (11th Cir.1992), and/or the defendant himself, *United States v. Edwards,* 897 F.2d 445, 446–47 (9th Cir. 1990); *United States v. Bernloehr,* 833 F.2d 749, 752 (8th Cir.1987)(citing *United States v. Systems Architects, Inc.,* 757 F.2d 373, 375 (1st Cir.1985)). The First Circuit seems to have assigned responsibility for protecting a defendant's right to testify to both the defendant and defense counsel, depending on the circumstances. In *Systems Architects,* the court held that the trial court need not obtain an on-the-record waiver of the right to testify where the court had no reason to suspect a disagreement between counsel and client regarding the client's right to testify. In reaching their decision, the *Systems Architects* panel implied that unless the court or defendant's counsel prevented the defendant from testifying, "the accused must act affirmatively" in protecting his right to testify. 757 F.2d at 375. The court also described the decision to testify or not as "primarily a matter of trial strategy to be decided between the defendant and his attorney." *Id.*

In *Siciliano v. Vose,* 834 F.2d 29, 30–31 (1st Cir.1987), the court upheld summary

---

(3) that the investigation would have uncovered exculpatory evidence. Were the Court of the belief that Petitioner's allegations supported a claim of ineffective assistance, the Court would nonetheless require evidentiary substantiation, such as an affidavit from trial counsel, prior to granting a hearing or otherwise investing judicial resources. *Cf. Underwood v. Clark,* 939 F.2d 473, 477 (7th Cir.1991).

**6.** The Court ordered the government to brief its position regarding how the Court should approach this aspect of Petitioner's motion. The Assistant United States Attorney, in her Motion in Compliance with Court Order, provided no useful input on this important point. This marks the fourth instance during the litigation of this case in which the Assistant United States Attorney has failed to obey one of the Court's orders. The Court will not tolerate such conduct and

suggests that the Assistant United States Attorney take a little more interest in the cases on which she is working. For repeatedly failing to follow the Court's Orders, the Court hereby **SANCTIONS ASSISTANT UNITED STATES ATTORNEY DOROTHY FERRER IN THE AMOUNT OF $500.00, PAYABLE TO THE CLERK OF THE COURT ON OR BEFORE JULY 17, 1998. FAILURE TO COMPLY WITH THIS ORDER MAY RESULT IN SERIOUS DISCIPLINARY CONSEQUENCES.** Petitioner's jailhouse attorney, on the other hand, filed a well-researched, well-thought-out, and useful memorandum on how the Court should analyze this claim. Were the issue of less importance, the Court would simply adopt Petitioner's position. But the Court deems the question to be sufficiently consequential to merit independent review.

dismissal of a habeas petition like Petitioner's. Siciliano first asserted "that the Constitution requires a trial judge specifically to address a criminal defendant, to explain to the defendant that he has a right to testify, and to ask the defendant whether he wishes to waive that right." The First Circuit denied that contention in no uncertain terms— "we reject appellant's first claim because we do not believe that federal law contains any such procedural requirement." *Id.* at 30. In reaching the conclusion that a trial court has no affirmative duty to protect a defendant's right to testify, Judge Breyer stated that "a criminal defendant 'must claim' his privilege or right to testify 'by attempting to take the stand or it is waived.' " *Id.* (quoting *United States v. Ives,* 504 F.2d 935, 939–40 (9th Cir.1974) (subsequent history regarding other grounds omitted)).[7]

The *Siciliano* court also upheld the district court's summary dismissal of Siciliano's claim that his attorney, by preventing him from testifying, rendered his trial unlawful. In denying his claim, the *Siciliano* court put the burden squarely on the habeas petitioner's shoulders, first, to make specific allegations that his attorney "told [him] that he was legally forbidden to testify or in some similar way compelled him to remain silent" and, second, to find support on the record for the conclusion that "such specific factual allegations would be credible." 834 F.2d at 30–31; *see also Edwards,* 897 F.2d at 446–47 (even where defendant claims he was unaware of his right to testify and his attorney refused to call him to testify, his silence waives the right).

In *Lema v. United States,* the court loosely incorporated the question of petitioner's waiver into the *Strickland* analysis, stating that, "unaccompanied by coercion, legal advice concerning exercise of the right to testi-

fy infringes no right, [citations omitted], but simply discharges defense counsel's ethical responsibility to the accused." 987 F.2d 48, 52 (1st Cir.1993). Finding, based on facts obtained by the district court at an evidentiary hearing, that Lema's attorney neither employed coercion nor otherwise overbore Lema's will, the court found that Lema had waived his right to testify.

■ Synthesizing *Systems Architects, Siciliano,* and *Lema,* and searching for guidance in the decisions from other circuits, the Court will apply the following analysis to Petitioner's claim that he was deprived of his right to testify. As an initial matter, absent extraordinary circumstances that should alert the trial court to a conflict between attorney and client, the Court should not inquire as to a criminal defendant's desire to testify. *See Systems Architects,* 757 F.2d at 375–76; *e.g., United States v. Joelson,* 7 F.3d 174, 177 (9th Cir.1993) (demonstrating the problems apt to arise from trial court discussing defendant's right to testify). The court should assume that a criminal defendant, by not "attempting to take the stand," has knowingly and voluntarily waived his right. *See Siciliano,* 834 F.2d at 30 (requiring the court to secure an on-the-record explicit waiver could inappropriately influence the defendant to waive his constitutional right not to testify, thus threatening the exercise of this other, converse, constitutionally explicit, and more fragile right). *See also Teague,* 953 F.2d at 1533 n. 8 (11th Cir.1992) ("We believe that it would be inappropriate to require the trial court to discuss this choice with the defendant. Such a requirement would unnecessarily intrude into the attorney-client relationship and could unintentionally influence the defendant on his or

7. *See also United States v. Edwards,* 897 F.2d 445 (9th Cir.1990) (relying on *United States v. Martinez,* 883 F.2d 750, *vacated on other grounds,* 928 F.2d 1470 (9th Cir.1991)); *cf. El–Tabech v. Hopkins,* 997 F.2d 386, 388–89 (8th Cir.1993). Although the issue has been debated, *see Martinez,* 883 F.2d at 764 (Reinhardt, J., dissenting); Reed Harvey, Note, *Waiver of the Criminal Defendant's Right to Testify: Constitutional Implications,* 60 Fordham L.Rev. 175 (1991); Timothy P. O'Neill, *Vindicating the Defendant's Constitution-*

*al Right to Testify at a Criminal Trial: The Need for an On–the–Record Waiver,* 51 U. Pitt. L.Rev. 809 (1990), the Court has found no federal legal precedent expressly disagreeing with *Siciliano*'s holding that the court has no duty to obtain an on-the-record waiver from a criminal defendant. Therefore, in light of *Siciliano*'s clear holding and the fact that Petitioner has not claimed that this Court erred in failing to obtain an on-the-record waiver from him, the Court will not address this issue further.

her choice").[8] The rule is not inflexible and there may arise unusual circumstances that would require the trial court to make inquiries, but as Petitioner has not raised the issue and as the facts of his case do implicate such a requirement, the Court will not attempt to delineate the parameters of that fact-specific inquiry.

Second, the court must consider whether the petitioner has waived his right to testify. Based on *Siciliano*, the Court will presume that a criminal defendant who fails to claim his right to testify at trial waives that right. *See Siciliano*, 834 F.2d at 30; *Bernloehr*, 833 F.2d at 751–52; *Edwards*, 897 F.2d at 446–47. A habeas petitioner may rebut that presumption, however, by showing that his attorney caused him to forego his right to testify. But mere conclusory allegations are insufficient. To rebut the presumption that his silence waived his right to testify, a petitioner must first allege specific facts from which a court could reasonably find that trial counsel "told [the petitioner] that he was legally forbidden to testify or in some similar way compelled him to remain silent." He must also demonstrate, from the record, that those "specific factual allegations would be credible." *Siciliano*, 834 F.2d at 31; *Zannino v. United States*, 871 F.Supp. 79, 83–85 (D.Mass.1994). This requirement is merely the operation of the rule, generally applicable in all habeas proceedings brought under 28 U.S.C. § 2255, that absent a hearing courts must accept a petitioner's allegations as true, except to the extent they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact. *David v. United States*, 134 F.3d 470, 477–78 (1st Cir.1998); *Myatt v. United States*, 875 F.2d 8, 11 (1st Cir.1989)("even if a § 2255 is facially adequate, a hearing is not necessary before dismissal if the motion is conclusively

refuted as to the alleged facts by the files and the records of the case"). But where a petitioner raises the claim that his attorney's conduct undermined his right to testify, the need to scrutinize the allegations takes on a particular importance. The United States Court of Appeals for the Seventh Circuit elucidated the reasoning underlying this need:

> There is a grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify in his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial" . . .

> We agree with the First Circuit's ruling in *Siciliano v. Vose*, 834 F.2d 29, 31 (1st Cir.1987), that this barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary—and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify—to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

*Underwood v. Clark*, 939 F.2d 473, 475–76 (7th Cir.1991). Based on this reasoning, the Court will dismiss any § 2255 motions claiming that the petitioner's lawyer impaired his

---

8. *See also Brown v. Artuz*, 124 F.3d 73, 79 n. 2 (2nd Cir.1997):

Several circuits have ruled that although a trial judge generally is not required "to advise the defendant of the right to testify or to obtain an on-the-record waiver of such right," *United States v. Pennycooke*, 65 F.3d 9, 13 (3rd Cir. 1995), "judicial intervention through a direct colloquy with the defendant may be required in exceptional, narrowly defined circumstances," *id.* at 12. For instance, where the

trial judge has reason to believe that defense counsel is frustrating the defendant's desire to testify, *id.* at 13, where the defendant has expressed his desire to testify to the court, *see Ortega v. O'Leary*, 843 F.2d 258, 261 (7th Cir. 1988), or where "there appears to be no rational explanation for the decision" not to testify, *United States v. Ortiz*, 82 F.3d 1066, 1071 (D.C.Cir.1996), some courts have concluded that the trial judge should inquire directly of the defendant concerning his right to testify.

right to testify which are not based upon specific allegations supported by the record. Furthermore, in determining whether a petitioner's allegations are so supported, the Court will conduct an independent examination of the record if necessary. *E.g., Lema,* 987 F.2d at 53 (going beyond findings of fact made by district court to consider defendant's familiarity with the justice system and his conduct); *Bernloehr,* 833 F.2d at 751–52 (considering defendant's personal characteristics); *Zannino,* 871 F.Supp. at 84–85.

Finally, if the petitioner successfully rebuts the presumption that, by his silence, he knowingly and voluntarily waived his right to testify, the court must analyze his claim as one for constitutional trial error (as opposed to a structural defect requiring automatic reversal of the conviction) and apply harmless error analysis. This Court recognizes that most other courts facing allegations that defense counsel prevented a client from testifying have at least started under the correct analytical framework applied to claims of ineffective assistance. But the Court rejects the use of the *Strickland* analysis in such cases. The Court agrees with the Fifth Circuit that the right to testify exists independently of the right to counsel. *Jordan,* 34 F.3d at 316 n. 5.[9] Regardless of whether the denial of the right to testify can be ascribed to defense counsel's conduct, the deprivation complained of is not effective assistance but the right to testify, and the right to testify is itself constitutionally protected. Therefore, the denial of the right amounts to a constitutional error. It is not, however, a structural error defying harmless error analysis. *Id.* It is, instead, a "trial error," because the denial of a criminal defendant's right to testify can be "quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial." *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Arizona v. Fulminante,*

499 U.S. 279, 307–308, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). The Court concurs with the *Jordan* court in holding that the deprivation of the right to testify is a trial type constitutional error because the petitioner can proffer the testimony he was allegedly prevented from giving at trial, and the habeas court can determine, based on the other evidence, what effect the denial had on the outcome of the trial.

Turning to the case at bar, Petitioner's makes the following specific allegations:

> Movant repeatedly sought to assert his right to testify. It was this lack of communication and disagreement over the approach the defense should take that prompted Movant to seek to relieve counsel. While counsel met with and assured Movant that he would have a chance to present his case [sic]. Counsel without informing Movant of his reasoning refused to call him, even though counsel was fully aware that movant desired to testify. This is not a case were the movant did not know he could testify, nor one where counsel advised defendant not to testify and defendant acted on his lawyer's advice; not testifying despite his desire to do so, rather the failure to present testimony was unknowing and unintelligent waiver. The movant asserts herein that he wanted to testify and that counsel prevented him from so doing.

Petitioner's allegations require the following explanation: Just prior to trial, Petitioner sent the undersigned judge, who presided over his criminal trial, a letter requesting a change in lawyer. The basis for the request was Petitioner's belief that his attorney was not communicating with him. In response to the letter, the Court questioned Petitioner and his counsel in open court and on the record. His attorney explained that the letter resulted from a misunderstanding—his attorney had informed him that he would

---

9. For a thorough discussion of the origins of the right to testify, *see Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) and *United States v. Teague,* 953 F.2d 1525 (11th Cir. 1992)(en banc). The *Rock* court traced the right to: (1) the due process clause of the Fifth and Fourteenth Amendments, (2) the privilege against self-incrimination protected by the Fifth and Fourteenth Amendments, (3) the compulsory process clause of the Sixth Amendment, and (4) the right to self-representation gleaned from the Sixth Amendment's "structure" in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The right is clearly independent of the Sixth Amendment right to counsel.

meet with him over a weekend but did not see him until the following Monday or Tuesday—that led Petitioner to become anxious and write to the Court. After hearing his attorney's explanation, the Court asked Petitioner how he felt, and Petitioner, having also just heard his attorney's explanation stated, "Your Honor, I am satisfied with my attorney."

Petitioner's motion fails to rebut the presumption that his silence at trial qualified as a waiver of his right to testify. First, his motion does not contain specific allegations to the effect that his attorney "told him that he was legally forbidden to testify or in some other way compelled him to remain silent." *Siciliano*, 834 F.2d at 31. Second, the factual allegations contained in Petitioner's motion are defied by the record. *Id.*

Petitioner does not allege that his attorney told him he was "legally forbidden to testify;" nor does he allege that his counsel "in some similar way compelled him to remain silent." *Id.* The Court recognizes that the *Siciliano* court was faced with a slightly different scenario. In *Siciliano*, the defendant "heard the judge say he had a right to testify but said nothing," and, therefore was deemed to have known his right. Here, Petitioner claims he did not know of his right to testify, and the United States has not pointed to any proof in the record to the contrary. But the Court does not accept Plaintiff's claim that he did not know that he had the right to testify. In this case, Petitioner alleges that he wrote the Court a letter requesting the appointment of new counsel because he disagreed with his attorney's advice not to testify. He further asserts that, prior to trial, his attorney acquiesced to his demand to testify. Indeed, Petitioner personally stood in court just prior to opening statements and informed the undersigned judge that he was satisfied with his attorney. From that statement, the Court must assume that Petitioner and his counsel were reconciled regarding Petitioner's wish to testify. Furthermore, Petitioner does not allege that his attorney misinformed him regarding his right to testify or in some other way coerced him to relinquish his right to testify. If his attorney reneged on his alleged promise to call Petitioner, the Court sees no reason to believe

Petitioner would not have complained to the Court again. He had done it once before for the same reason. Therefore, whether or not he knew he had a *constitutionally protected* right to testify, he clearly exhibited an intent, according to his own allegations, to ensure that his counsel would call him at trial if he so wished. The Court must assume from his silence and from the absence of any allegations that his silence was based on misinformation or coercion from his attorney that Petitioner did not wish to testify. *Cf. Lema*, 987 F.2d at 53 (vehemence with which a criminal defendant seeks to testify on his own behalf reflects defendant's "clear awareness that the ultimate decision was [defendant's] to make"). The record, in conjunction with Petitioner's allegations, plainly demonstrates that Petitioner, by his silence, waived his right to testify.

In reaching the conclusion that Petitioner waived his right to testify, the Court has assumed the veracity of Petitioner's factual allegations. But in truth, Petitioner's allegations are "wholly incredible" and made without specific and detailed supporting facts and should be summarily dismissed. *David*, 134 F.3d at 477; *United States v. Butt*, 731 F.2d 75, 77 (1st Cir.1984). Petitioner claims that he "repeatedly sought to assert his right to testify" and that his counsel's disagreement with his wishes "prompted [Petitioner] to seek to relieve counsel." But when the Court asked Petitioner's attorney about Petitioner's letter, he informed the Court that something completely different had prompted Petitioner to seek new counsel. The Court gave Petitioner, who had just heard his attorney's interpretation of the situation, the opportunity to explain his position (which, based on his willingness to go directly to the court regarding his attorney's conduct, was something he was apparently not squeamish about doing), but Petitioner neither expressly disagreed with his attorney's position nor gave an incompatible explanation. He merely stated that he was satisfied with his attorney's conduct. Therefore, the only portion of the record to which Petitioner's allegations refer actually refutes his allegations.

Moreover, the Court notes that Petitioner accepted and utilized his trial attorney's ser-

vices on direct appeal. If Petitioner's allegations are to be believed, his attorney duped him into withdrawing his letter seeking new counsel by promising Petitioner he could testify at trial and then failed to call him to testify. According to Petitioner's assertions, his attorney lied to him about something Petitioner considered to be of great importance. In the motion at bar, Petitioner argues that his attorney's duplicity cost him a conviction, something which he would have known prior to filing his appeal. The Court cannot imagine a criminal defendant, under the circumstances alleged by Petitioner, accepting the services of the attorney that bamboozled him for his appeal. That would be "odd behavior indeed from one who claims he was betrayed on a vital issue by his attorney." *See Zannino,* 871 F.Supp. at 85.

 At this point, the Court need not go further, because Petitioner's Motion fails to surmount the barriers placed by *Siciliano.* But even if the Court had found that Petitioner successfully made a showing that trial error was committed, Petitioner would not necessarily be entitled to relief, or even a hearing. Under *Brecht,* the Court must apply harmless error analysis to Petitioner's claim on collateral review. *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. That analysis is governed by *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Under *Kotteakos,* the Court must determine "whether, in light of the record as a whole, the [trial error] had a substantial and injurious effect or influence in determining the jury's verdict." 328 U.S. at 776, 66 S.Ct. 1239. "Under this standard, habeas petitioners ... are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)).

Petitioner has not provided an affidavit or proffer regarding the testimony he would have presented had he been permitted to testify, but, for the purposes of argument, the Court infers from his motion that he would have told the jury that he was a diesel mechanic; that he was hired to make the journey in order to maintain the SHEME's engines; that he knew nothing of the contraband or the purpose of the SHEME's voyage; and that he was in the engine room when the other crewmembers were hiding the cocaine. While it is rarely possible to state with absolute certainty that exculpatory testimony provided by a criminal defendant would not have affected the outcome of the trial that ended with a guilty verdict, the Court holds that Petitioner fails to surmount the harmless error burden by his proffer. In this case, Petitioner adduced evidence at trial from which the jury could infer that he was the ship's mechanic—his business cards showing that he was a mechanic. During closing, Petitioner's attorney explained to the jury that Petitioner was aboard the SHEME as a mechanic, questioned the feasibility of the government's position that grease on each of the Defendant's clothes meant that each had been in the secret compartment containing the cocaine, and argued that the government had failed to establish Petitioner's knowledge of the contraband or the purpose of the voyage. Petitioner's proffered testimony would have added only one new evidentiary wrinkle—that Petitioner was covered in engine oil, not grease, when the Coast Guard came aboard the SHEME.

In light of the other evidence, the inclusion of this bit of testimony, by itself, would certainly not have compelled the jury to acquit Petitioner. The evidence demonstrated that the shipment of drugs was large, the voyage was relatively long, and that the ship was relatively small—circumstantial evidence from which a jury could well have inferred Petitioner's knowledge and intent, regardless of whether he had been working on the engine when the others emptied some of the cocaine packages. Moreover, Petitioner's proffered story strains credulity. It is hardly likely that a reasonable jury would have believed the incredible coincidence that (1) Petitioner happened to be repairing the SHEME's engine the night the SHEME was intercepted by the Coast Guard, forcing two or three members of the four member crew to begin unloading cocaine from a large stash stored in grease covered compartment; (2) that although everyone aboard the vessel other than the captain was covered in grease, Petitioner was covered in *a different type of grease* and had not been involved in the desperate endeavor that soiled his compatriots; and (3) that he had only joined his fellow

crewmembers after hearing the commotion, and that by that time, they had completed opening the inspection plate, crawling into the secret compartment, and emptied several large containers of cocaine. In short, Petitioner has not met his burden under *Brecht* by demonstrating that the denial of his right to testify actually prejudiced his defense.

## III. CONCLUSION

Petitioner's allegations that his attorney failed to obtain a chemical analysis of his clothing and to scientifically determine whether the SHEME's engine had been repaired the night the Coast Guard boarded her fails to satisfy the first prong of *Strickland* Therefore, Petitioner has failed to make out a viable claim of ineffective assistance based on his trial attorney's alleged failure to investigate. Moreover, Petitioner waived his right to testify during his criminal trial and failed to demonstrate that the denial of that right, had it occurred, was other than harmless error. For the foregoing reasons, the Court hereby **ENTERS JUDGMENT DISMISSING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 WITH PREJUDICE.**

IT IS SO ORDERED, ADJUDGED, AND DECREED.